UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC T. DREW,

        Plaintiff,                          No. 13-11460

v.                                        District Judge Mark A. Goldsmith
                                                Magistrate Judge R. Steven Whalen

ENTERPRISE LEASING OF
DETROIT, LLC, ET AL.,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

On March 29, 2013, Plaintiff Eric T. Drew filed a *pro se* civil complaint alleging that he was terminated from his employment with Defendant Enterprise Leasing of Detroit, LLC ("Enterprise") for racially discriminatory reasons, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20003-5(g). Before the Court is Defendant Enterprise's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [Doc. #23], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that the motion be GRANTED.

**I.    FACTS**

The Plaintiff's form complaint alleges, in bare-bones fashion, that his employer, Defendant Enterprise Leasing of Detroit, LLC, engaged in acts of harassment and discrimination based on race from June 2, 2011 to October 4, 2011, culminating in the termination of his employment. He alleges "constant harassment & retaliation for filing a grievance against the operation's manager and also receiving adverse treatment &

discipline as opposed to other races of individuals." Although ¶ 11 of the complaint states that a copy of Plaintiff's charge to the EEOC is attached, no such document was filed with the complaint. Only the EEOC's right to sue letter is attached. However, Enterprise has submitted a copy of the Plaintiff's EEOC charge as Exhibit 15. The charge states as follows:

> "On or about May 30, 2011, I was suspended without pay for an alleged policy violation. On or about June 29, 2011, I filed a grievance regarding the aforementioned suspension; I was subsequently compensated for forty hours (one week) of the one hundred twenty-eight hours (approximately three weeks) for which I was suspended. On August 8, 2011, I was suspended without pay for affixing the incorrect name to a rental contract. On August 21, 2011, I was disciplined for allegedly having cash receipts unattended as I sought a Manager to verify the receipts. I filed a grievance and the disciplinary action was rescinded. On or about October 4, 2011, I was discharged for alleged performance issues. I am aware of former Caucasian co-workers that were not disciplined for the same or similar reasons which resulted in my suspensions and discharge.
>
> "I believe that I was disciplined because of my race, African-American, and subsequently discharged in retaliation for have (sic) filed grievances regarding my received suspension, in violation of Title VII of the Civil Rights Act of 1964, as amended."

At his deposition, the Plaintiff testified that he was aware of Enterprise's written rules of conduct, which provided that an employee could be terminated for dishonesty, fraud, or theft after the first occurrence. *Plaintiff's Deposition*, Defendant's Exhibit 2, 104-105. *See also* Defendant's Exhibit 8 (standards of conduct).

Defendant's Exhibit 4 is the declaration of Patricia A. Lis, Enterprise's Group Human Resources Manager. Ms. Lis states that Enterprise Rental Agents are forbidden from changing or downgrading a reservation, and then later "upselling" the customer to a more expensive car in order to increase the Agent's commission. *Lis Declaration*, ¶ 6. She states that from December, 2009 to August, 2011, Plaintiff "was counseled numerous times regarding customer service, performance and attendance issues." *Id*. ¶ 7. In May

-2-

2011, Enterprise conducted an investigation following a customer's complaint as to certain charges. Enterprise found that "Plaintiff had violated the Rental, Return and Rate Integrity Policy through his fraudulent behavior regarding the rental car agreement." *Id*. ¶ 9. The Plaintiff was suspended, but in order to resolve his subsequent grievance, he was paid for five days of the eight-day suspension. *Id*. ¶¶ 10-11.

Ms. Lis states that in July, 2011, Plaintiff was suspended for one day for mishandling a rental agreement, in violation of the Standards of Conduct. *Id*. ¶ 12. In September of 2011, a customer complained about a $250 car upgrade charge on his bill. During the course of the investigation of this complaint, Enterprise discovered that "Plaintiff improperly and dishonestly charged at least seven different customers with an increased/upgraded rate, and/or charged them for ancillary products that they did not request, agree to or were even aware of. Some of these customers were charged increases/upgrades that amounted to between $100 to $650 dollars per day on car rentals. As a result, the dollar value of the upgrades was often more than the cost of the rental itself." *Id*. ¶¶ 13-14. Plaintiff's employment was terminated on October 4, 2011, "due to his fraudulent behavior and dishonesty with rental contracts." *Id*. ¶ 18. Ms. Lis states that Kevin Moore, not C.J. Stachecki, made the determination to fire the Plaintiff. Mr. Moore is African-American. *Id*. ¶ 19.

Defendant's Exhibits 10 and 12 contain disciplinary reports documenting Plaintiff's misconducts between December, 2009 and July 29, 2011. These include excessive tardiness in 2009 and 2010, improperly filling out contracts in June, 2010, improperly safeguarding GPS units in April, 2011, and leaving $1,000 cash unattended on August 16, 2011 (Exhibit 10). In July, 2011, Plaintiff was given a one-day suspension for mishandling a reservation, which caused a customer to have to wait while the situation

was resolved (Exhibit 12).

Defendant's Exhibit 13 contains Enterprise's investigative notes, accompanied by rental contracts and computer screen-shots, detailing seven instances in August and September, 2011 where Plaintiff manipulated rental agreements to upgrade the customers' requests or add expensive options that the customers did not request. Exhibit 13 shows the following:

(1) Plaintiff created a rental agreement on September 12, 2011 at 6:14 pm, but when the customer returned the car, "he noticed a significant charge for a car class upgrade," and disputed that charge. According to the rental agreement history, as shown by the accompanying screen-shots, "Eric added a $500 per day upgrade amount at 6:31 pm. After the customer had already left, Eric continues to go back into the rental agreement seven more times. At 7:14 pm, Eric inputs the $500 per day upgrade again. At 7:26 pm, 54 minutes after the customer left the office with the vehicle, Eric added an upgrade amount of $650 per day to the rental agreement. The customer was not present to sign the contract for this amount."

(2) On August 22, 2011 at 7:39 pm, Plaintiff created a rental agreement. The reserved rate was $37.00 per day. However, the customer, who called "crying hysterically," was "astounded that the bill was $828.60." Plaintiff charged the customer for an intermediate SUV, though she drive a full-size car. The report states that "[b]esides manipulating the rate, Eric added GPS, Personal Accident Insurance, Supplemental Liability Insurance, as well as the Fuel Service Option to the rental agreement."

(3) Plaintiff created a rental agreement on September 19, 2011 at 8:53 pm. Upon inspecting her receipt, the customer noted charges for Roadside Plus, Personal Accident Insurance, Supplemental Liability Insurance, Fuel Service Option, and GPS, options that

she had not agreed to.

(4) Plaintiff created a rental agreement on September 19, 2011 at 5:11 pm, but added an upgrade charge of $159.99 without the customer's approval. "The customer disputed the charge immediately upon return."

(5) Plaintiff created a rental agreement on September 20, 2011. The customer complained about being charged for additional items that he had not requested, including Loss Damage Waiver, Personal Accident Insurance, Roadside Plus, and Supplemental Liability Insurance. The report states that "[a]ll of these items were added by Eric without consent from the customer."

(6) Plaintiff created a rental agreement on September 12, 2011 at 9:54 pm. Plaintiff manipulated the product code to give the customer an added discount of 20 percent, and provided a Premium SUV, even though the customer was charged for a Luxury.

(7) Plaintiff created a rental agreement on August 21, 2011. The customer had a rewards coupon that was to provide two free days rental for an ICAR on reservation. Plaintiff manipulated the product code for the rental agreement, "therefore charging the coupon $480.00 instead of the $225.54 that was set up in the reservation."

At his deposition, Plaintiff stated that he would receive a higher commission on a rental if the customer's vehicle or equipment were upgraded. *Plaintiff's Deposition* [Defendant's Exhibit 2], Vol. I, at 100.  He expressed his belief that Enterprise retaliated against him because he had filed a union grievance against the Operations Manager, "C.J." *Id* 125-128. He testified that in August or September of 2009, C.J. told him "[t]hat his goal was to make the rental counter a reflection of the people who rent from them." *Id*. 147-150. Plaintiff "assumed" that C.J. was referring to race. *Id*. Plaintiff testified that he was constantly "pulled into the office," and that nobody else was subjected to that

level of criticism. However, he said that about 30 percent of the disciplinary complaints against him were legitimate. *Id*. 154-155. Regarding the unrequested upgrades, Plaintiff testified that other employees, both black and white, were questioned about upgrades, but not as often as he experienced. He stated that a white employee "got fired from doing something, but this was out blatant." *Id*. 172. He said that a "white guy" who was "from Romania or something like that" was "fired for doing something unjustly." *Id*. 195.

Defendant has proffered as Exhibit 18 a disciplinary form involving a Caucasian employee with a Romanian surname, Adrian Sandulescu, who was fired on November 3, 2010 after he "admitted to adding coupons to contracts in order to increase" his commissions. Enterprise terminated his employment "for falsification of company documents, unethical practices and performance cheating."

Plaintiff conceded that he changed a rental contract, that he did an upgrade, and that a customer complained. *Id*. 195-197.

## II. STANDARD OF REVIEW
### A. Rule 12(b)(6)

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint "for failure of the pleading to state a claim upon which relief can be granted." Rule 12(b) also provides that if, on consideration of a motion under paragraph (6), "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 (summary judgment)." In assessing a Rule 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, and asks whether, as a matter of law, the plaintiff is entitled to legal relief. *Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir. 2001).

In assessing the legal sufficiency of a complaint, the court must first determine

whether a complaint contains factual allegations, as opposed to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, 556 U.S. at 676 (citing *Bell Atlantic Corp. v. Twombley*, 550 U.S 544, 555 (2007)). Second, the facts that are pled must show a "plausible" claim for relief, which the Court described as follows:

> "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."

### B. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III. DISCUSSION

Plaintiff's form Title VII complaint, used by *pro se* litigants, indicates that the charge to the EEOC should be attached and should constitute the statement of facts. However, while the Plaintiff attached the right to sue letter to his complaint, he did not submit the EEOC charge or any other factual material. Being thus reduced to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 676, the complaint does not plausibly state a claim under current pleading standards, and could be dismissed on that basis.

However, Defendant has gone forward with discovery, and has provided numerous exhibits, including excerpts of the Plaintiff's deposition, disciplinary forms, and a declaration of its Human Resources Manager. I will therefore also analyze the motion

under the summary judgment standards of Rule 56.

### A.   The Plaintiff's Termination

Plaintiff has neither pled nor offered any evidence that anyone in a decision-making position expressly stated a desire to fire him or take any other adverse action based on race. Thus, his claim of racial discrimination under Title VII is based on circumstantial evidence. In such case, the burden-shifting approach first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865-66 (6th Cir. 2003). Under that framework, the Plaintiff must present a prima facie case of unlawful discrimination. Once he has done so, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).[1] If the Defendant satisfies that burden, the Plaintiff must then prove, by a preponderance of the evidence, that the proffered reason for the Defendant's actions is not the true reason, but rather a pretext for discrimination.

In order to establish a prima facie showing of racial discrimination, the Plaintiff must introduce sufficient evidence that (1) he was a member of the protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination. *McDonnell Douglas, supra,* 411 U.S. at 802. The last factor is generally shown by evidence that the plaintiff was "treated differently from similarly situated individuals outside of [the] protected class." *Smith v. City of Salem, Ohio,* 378 F.3d 566, 570 (6th Cir. 2004)(*citing Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000));

---

[1]This is a burden of production. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

*McDonnell Douglas, supra,* 411 U.S. at 802, 1824. However, this factor may take various forms, depending upon the facts and allegations of a particular case. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, n.6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Hazle v. Ford Motor Company*, 464 Mich. 456, 463, n.6, 628 N.W.2d 515 (2001) ("the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand"); *Shah v. General Electric Company*, 816 F.2d 264, 268-271 (6th Cir. 1987) ("However articulated, the significance of the prima facie case is that it permits an 'inference of discrimination...because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'") (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

### 1. The Prima Facie Case

Plaintiff is a member of a protected class, and being fired is a prototypic adverse employment action. Apart from the misconduct, Defendant does not argue that Plaintiff was otherwise unqualified for the job.[2] Plaintiff has therefore satisfied the first three prongs of a prima facie case.

The fourth element–that the Plaintiff was fired under circumstances giving rise to an inference of discrimination–is more problematic. Apart from his own speculation and subjective belief, Plaintiff has simply not shown that employees outside his protected

---

[2] In *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 -661 (6th Cir. 2000), the Sixth Circuit warned against using the purported non-pretextual reason for the adverse action–which would be relevant to the second stage of the *McDonnell Douglas* inquiry–to defeat a discrimination claim at the initial prima facie phase of the analysis. *Cline* held that the "qualified prong" of the prima facie analysis focuses on the plaintiff's employment record *prior to* the events that the employer cites as the legitimate reason for the adverse action. *Id*. at 662-63. *See also Peters v. Lincoln Electric Company*, 285 F.3d 456, 473 (6th Cir. 2003).

class, who committed the same or similar infractions, were not fired, or were treated more favorably. He conceded at his deposition that both white and black employees were "pulled into the office" regarding customer complaints and questionable upgrades. He understood Enterprise's policies that provided for termination after the first instance of fraud or dishonesty. Indeed, Adrian Sandulescu, a white employee, was fired for similar fraudulent conduct. Kevin Moore, himself African-American, made the decision to fire the Plaintiff. "[R]umors, conclusory allegations and subjective beliefs...are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 585 (6th Cir. 1992).

I recognize that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Cline, supra*, 206 F.3d at 660, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). But it is not a free pass either, and a plaintiff must present *something* other than speculation and opinion to raise an inference of racial discrimination. Plaintiff has offered nothing to support the fourth prong of the *McDonnell Douglas* prima facie evidence test, and for that reason, summary judgment for the Defendant is appropriate.

### 2. Pretext

Assuming for the sake of argument that Plaintiff had established a prima facie case, the Defendant has proffered strong evidence that Plaintiff was fired for a non-discriminatory reason. Defendant's Exhibit 13 chronicles numerous incidents where, in clear violation of Enterprise's policies, Plaintiff upgraded rental contracts without the customers' consent, to his own benefit and to the customers' consternation. Enterprise's policies provide that acts of dishonesty, fraud, or theft can result in termination after the first occurrence. The Defendant has met its burden of showing a non-discriminatory

reason for firing the Plaintiff.

Under the third prong of *McDonnell Douglas*, the burden now shifts back to the Plaintiff to show that the Defendant's stated reasons are pretextual.  The Plaintiff may meet that burden by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not sufficient to motivate the discharge. *Smith v. Leggett Wire Co., supra*, 220 F.3d at 759 (citing *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)).

The Defendant's proffered reason for firing the Plaintiff–that he violated clear company policy regarding dishonesty and fraud, thereby subjecting himself to immediate termination–is well grounded in fact.  The Defendant's written policies and Exhibit 13 speak for themselves.

The Plaintiff has not shown that the Defendant's proffered reason did not actually motivate the decision to fire him.  As discussed in the preceding section, Plaintiff has not provided any non-speculative evidence that employees who are not in a protected class were treated more favorably after committing similar misconduct. To the contrary, a Caucasian employee was fired for conduct similar to the Plaintiff's.

Finally, Enterprise's written policies are clear that misconduct involving dishonesty, fraud, or theft is punishable by termination after the first offense. Under those policies, as applied to the Plaintiff and to other employees, the Defendant's proffered reason is sufficient to motivate the Plaintiff's discharge.

The Plaintiff has failed to support any genuine issue of material fact as to his claim that his termination was racially motivated, and under the facts of this case, no rational trier of fact could find in his favor. *Simmons-Harris v. Zelman, supra*.  Therefore,

summary judgment should be granted in Defendant's favor.

### B. Hostile Work Environment

"To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) []he belonged to a protected group, (2) []he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co., Inc*., 643 F.3d 502, 511 (6th Cir. 2011)(citing *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1078–79 (6th Cir.1999)). A hostile work environment claim "offers employees protection from a 'workplace[ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment....' " *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 514 (6th Cir.2009) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)) (alteration in original).

Plaintiff is a member of a protected class, and he claims that he was subject to unwelcome harassment. To the extent that he characterizes the disciplinary actions taken against him as harassment, however, he has utterly failed to show that those actions were race based. As discussed in the preceding section, those actions were taken because Plaintiff violated company policies, and he has presented no evidence that white employees who committed similar infractions were treated more leniently. Plaintiff also claims that "C.J." Stachecki made a comment that he wanted rental agents "to be a reflection of the people who rent from us." While Plaintiff interpreted this comment to be race based, it was at most open to interpretation. C.J. did not make any more direct

statement that he only wanted white people to work the counter.

Plaintiff also claims that C.J. made a comment about his receding hairline. C.J. did not make this comment directly to the Plaintiff. Rather, Plaintiff testified that he heard about it from another manager. *Plaintiff's Deposition*, Vol. I, 151-154. People of all races have receding hairlines, and Plaintiff has provided no factual context that would permit a rational trier of fact to impute racial motives to this otherwise innocuous comment.

Moreover, these two isolated and ambiguous comments, even viewed in conjunction with the disciplinary actions taken against the Plaintiff, cannot be considered sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

Finally, Enterprise has an affirmative defense to the hostile work environment claim because Plaintiff did not pursue the corrective opportunities it provided to its employees. *Lis Declaration*, Defendant's Exhibit 4, ¶ 22. *See Faragher v. City of Boca Raton* 524 U.S. 775, 777-778 (1998)(employer has an affirmative defense if the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.").

### C. Retaliation

Plaintiff claims that C.J. Stachecki suspended him in June 2011 in retaliation for his having filed a grievance through his union. Since this claim is based on union activity, and thus involves an unfair labor practice, it falls within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). *See* 29 U.S.C. §§ 157 and 158; *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244-45 (1959)("When an activity is arguably subject to section 7 or section 8 of the [National Labor Relations Act], the states as well as the federal courts must defer to the exclusive competence of the National Labor

Relations Board"). Under circumstances similar to those alleged in the present case, the Court in *Broadbent v. Elliott-Lewis Corp.*, 2007 WL 2688290, *5 (N.D.Ohio 2007), applied preemption where there was a claim of retaliation for a union grievance:

> "[T]his Court finds that the plaintiffs' retaliation claim is preempted under *Garmon.* The plaintiffs allege that their employer engaged in the unfair labor practice by retaliating against them when they exercised their protected right under § 7 to file a grievance with their union....[T]he plaintiffs' state claim of retaliation based on their protected activity of filing a grievance with the union is identical to a § 7 and § 8 claim that could have and should have been filed with the NLRB. Accordingly, the NLRB has exclusive jurisdiction over the plaintiffs' retaliation claim, and the claim is preempted from this Court's jurisdiction pursuant to *Garmon*."

The Plaintiff's retaliation claim should therefore be dismissed.

### IV.   CONCLUSION

I recommend that Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [Doc. #23] be GRANTED, and that Defendant Enterprise be DISMISSED WITH PREJUDICE.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof, including weekends and intervening holidays, as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, including weekends and intervening holidays, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 27, 2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 27, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager
